STATE OF CONNECTICUT *v.* FREDERICK DAVIS, JR.
(AC 21306)

Lavery, C. J., and Flynn and West, Js.

Argued January 6—officially released May 13, 2003

Hope C. Seeley, with whom, on the brief, was *Patrick S. Bristol*, for the appellant (defendant).

*Robert J. Scheinblum*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Robin D. Cutuli*, assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Frederick Davis, Jr., appeals from the judgment of conviction, rendered after a jury trial, of three counts of risk of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21 (2). On appeal, the defendant claims that the court improperly (1) permitted an expert witness to testify as to the credibility of the victims, thereby denying him a fair trial, (2) denied him his right to confrontation by admitting constancy of accusation testimony, (3) denied his motion for a judgment of acquittal on the basis of insufficient evidence as to victim A, (4) violated his right to due process because the risk of injury counts were not transferred properly from the Juvenile Court to the regular criminal docket, (5) permitted the victims to testify via videotape outside his presence and (6) instructed the jury as to reasonable doubt, thereby lowering the state's burden of proof and depriving him of his right to a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The three minor victims[1] were ages five, six and

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victims or others through whom their identities may be ascertained. See General Statutes § 54-86e.

seven when they moved into a house on the cul-de-sac where the defendant lived in early September, 1998. The victims and the defendant were the only children who lived on the street. The victims are brothers, R and A, and their sister, N, who met the defendant shortly after moving. The defendant, who became fourteen years of age on October 26, 1998, was known to the victims as Joe. The victims often went to the defendant's home to ask him to play with them. The defendant frequently declined the invitation to join them. On occasion, the victims also tried to participate in whatever activities the defendant was engaged in with his teenage friends. At some point, the defendant agreed to play with the victims and to show them places in the neighborhood where he played when he was their age, and he rode bicycles, sledded and rollerbladed with them.

In late October, 1998, the defendant was touching the intimate parts of the victims and had them touch his intimate parts. The sexual contact continued until April, 1999, when the victims' mother learned of it. The sexual contact occurred at a variety of secluded locations adjacent to the houses on the cul-de-sac, including in a red shed and under a deck of a vacant house, under the deck of the defendant's home, in the shed in his backyard and in wooded areas. The defendant and the victims engaged in what the victims called rolling or rolling pee pees. The defendant compelled the victims to remove their pants and underwear and to lie on the ground. He also removed his pants and underwear. The victims then took turns lying on top of him and rolling back and forth. They rolled, in the victims' words, back privates and front privates. The defendant told the victims not to tell anyone what they were doing.[2]

---

[2] According to N, R had rolled pee pees sometime prior to the family's moving to the defendant's neighborhood and was punished for it. R was the first person N had heard use the term roll pee pees.

The defendant also pulled down R's pants and fondled the younger boy's penis. He compelled R to engage in penile to penile contact and penile to buttocks contact. The defendant rubbed his penis against A's penis. N demonstrated "Captain Black Eye" to the defendant by pulling down her pants and spreading her buttocks to expose her anus. N explained that her stepfather had shown her how to play Captain Black Eye. Subsequently, the defendant invited one of his friends to witness N expose herself. The defendant instructed N to show his friend Captain Black Eye, and she complied.

The victims' mother discovered that the defendant was having sexual contact with her children on April 24, 1999. The victims' mother called the children, who were playing in the neighborhood, to return home. N and A came home immediately, but R did not. When the mother asked A where his brother was, A informed her that "R was doing something very bad." When R came home, his mother asked what he had been doing. Initially, R was reluctant to tell his mother what he had been doing, but he eventually informed her that the defendant had pulled down his own pants as well as R's, and had forced R to masturbate him.

The victim's mother immediately went to the defendant's home to confront him. She informed the defendant's mother of R's accusation that the defendant had masturbated him. The mothers agreed that the defendant would stay away from the victims. Later that day, the victims' mother learned from N and A that the defendant had abused them, too. That night she reported the matter to the police. The next day she took her children to New Britain General Hospital where they were examined and interviewed by the hospital staff. She subsequently took them to Saint Francis Hospital and Medical Center's Children's Advocacy Center, where they were examined and interviewed further. The victims were referred for sexual abuse counseling.

Following a police investigation, the defendant was arrested and charged with three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2) and three counts of risk of injury to a child. Subsequent to the jury's convicting the defendant of three counts of risk of injury to a child,[3] the court gave the defendant an effective sentence of eight years in prison, suspended after thirty months, with ten years probation. The defendant appealed. Additional facts will be included as necessary.

I

The defendant's first claim is that the court improperly permitted one of the state's expert witnesses to testify that when the victims related their stories, they did not appear to have been coached. The defendant claims that by testifying in that manner, the expert witness vouched for the credibility of the victims. We disagree.

At trial, Kathleen Barrett, a psychologist at Saint Francis Hospital and Medical Center, testified about child sexual abuse, her experience investigating child sexual abuse cases and interviewing such victims. She explained how a trained interviewer could identify children who have been coached to report the abuse. She testified that she did not see any indication of coaching in the victims here. At trial, the defendant did not object to Barrett's direct testimony regarding coaching and now, on appeal, seeks plain error review of the claimed evidentiary error. See Practice Book § 60-5.

"Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error

---

[3] The jury acquitted the defendant of the three counts of sexual assault in the first degree.

is a doctrine that should be invoked sparingly. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Citations omitted; internal quotation marks omitted.) *State* v. *Toccaline*, 258 Conn. 542, 552–53, 783 A.2d 450 (2001).

Our Supreme Court has stated repeatedly that "an expert may not testify regarding the credibility of a particular victim. . . . Thus, [it has] recognized the critical distinction between admissible expert testimony on general or typical behavior[al] patterns of minor victims and inadmissible testimony directly concerning the particular victim's credibility." (Citations omitted; internal quotation marks omitted.) *State* v. *Grenier*, 257 Conn. 797, 806, 778 A.2d 159 (2001).

The defendant argues that the facts of this case are more similar to the facts of *Grenier* than they are to the facts of *Toccaline*. We disagree. In *Grenier*, in which the defendant preserved his claim at trial,[4] our Supreme Court ordered that the judgment of the trial court be

---

[4] The following testimony was offered by the victim's therapist in *Grenier*:

"[Assistant State's Attorney]: Okay. And did she provide you with any details regarding this alleged sexual assault?

"[Witness]: Yes. [*The victim's*] *statements were very credible.* She used a lot of sensory detail.

"[Defense Counsel]: Objection, Your Honor. My objection follows up on my—

"The Court: All, right. I'm going to allow it." (Emphasis in original; internal quotation marks omitted.) *State* v. *Grenier*, supra, 257 Conn. 803 n.7.

"[Assistant State's Attorney]: Okay. And what are you treating [the victim] for?

"[Witness]: It's a combination of her inappropriate behavior which continues today. It has to do with sexual acting out with other children, comments of a sexual nature and also *to treat the trauma of the abuse that she experienced.*"

"[Defense Counsel]: Your Honor, I'm going to object to that as conclusory and I make my same objection that I made with reference to [the first therapist] that—

"The Court: Overruled." (Emphasis in original; internal quotation marks omitted.) Id., 804 n.8.

reversed and that there be a new trial as a result of two of the victim's therapists having testified that the victim's reports of sexual abuse were credible. In that case, the state agreed with the defendant that the testimony was not admissible because it bore on the ultimate question of the victim's credibility. Id., 805. Our Supreme Court concluded that admission of the testimony did not constitute harmless error. Id., 806–807. In that case, the state failed to produce any physical evidence or eyewitness testimony of sexual abuse. Id., 807. The victim testified that the defendant had abused her, and the defendant testified that he had not. Id., 807–808. The testimony of the expert witnesses, therefore, "struck at the heart of the central—indeed, the only—issue in the case, namely, the relative credibility of [the victim] and the defendant." Id., 808.

In contrast, the defendant in *Toccaline* failed to object to the testimony of the expert witness, as is the case with the defendant here.[5] In *Toccaline*, there was medical evidence that the victim had been abused, and evidence of depression and change in the victim's character. *State* v. *Toccaline*, supra, 258 Conn. 552 n.13. In this case, there was no physical evidence of sexual contact. The victims' mother and two of their teachers, however, noticed behavioral changes in the victims after the defendant's sexual contact began.[6] The defen-

[5] In *Toccaline*, the victim's therapist "testified that [the victim] had described instances of sexual contact with the defendant. He also stated his opinion that the victim had suffered sexual abuse perpetrated by the defendant. Finally, [the therapist] testified that it was his opinion that [the victim's] testimony was truthful, based, in part, on the consistency of her accusations." *State* v. *Toccaline*, supra, 258 Conn. 548; see also id., 548–49 n.8.

[6] The victims' mother noted behavioral changes in each of the children beginning in November, 1998. R exhibited behavior changes in second grade that were so severe that he had to be medicated. R and A began to soil their underclothing, and A began to wet his bed. The boys both experienced nightmares. N's first grade teacher inquired whether something was wrong at home because the girl was becoming increasingly quiet at school and not acting like herself.

dant's friend testified that he witnessed the defendant order N to demonstrate Captain Black Eye.

Furthermore, the record demonstrates that the defendant did not object to Barrett's testimony concerning whether the victims had been coached, but cross-examined her in an effort to demonstrate that the victims, in fact, had been coached.[7] During summation, defense counsel argued to discredit Barrett's testimony that the victims did not appear to have been coached. In marshaling the evidence in its charge, the court drew the jury's attention to the defense position that the victims'

---

[7] For example, the defendant cross-examined Barrett in relevant part as follows:

"[Defense Counsel]: Now, you indicated that there was no indication that any of the children were coached; is that correct?

"[The Witness]: In the course of my interview, I did not find an indication that the children had been coached.

"[Defense Counsel]: Now, [A] was five years old at the time you spoke to him. Right?

"[The Witness]: Yes.

"[Defense Counsel]: And he was in kindergarten. Right?

"[The Witness]: That's my recollection.

"[Defense Counsel]: Now, when you asked him: When was the first time Joe did this? He said, April 20; is that correct?

"[The Witness]: He did—

"[Defense Counsel]: Now, did—

"[The Witness]:—I believe.

"[Defense Counsel]:—that strike you as unusual?

"[The Witness]: It's not uncommon for a child to guess at a date. So, it was a surprising response to me, but I think that that was the first time when I asked him that question. When was the first time that he did that to you, and he said April 20.

*** 

"[Defense Counsel]: Now, you said it's not unusual for a child to guess. Did you find it unusual that he picked out the month April?

"[The Witness]: Given that it was the current month, do you mean?

"[Defense Counsel]: For any reason.

"[The Witness]: I found it somewhat unusual for him—somewhat unusual, but not entirely unexpected for him to guess and say the month of April.

"[Defense Counsel]: It didn't occur to you that somebody must have been talking to him about the date April 20?

"[The Witness]: I didn't pursue that line of questioning with the child."

testimony had been coached.[8] The defendant did not object or take an exception to the charge as given. The defendant has taken a different tack on appeal.

A defendant cannot change his strategy on appeal. Our appellate courts frequently have stated that a party "may not pursue one course of action at trial for tactical reasons and later on appeal argue that the path he rejected should now be open to him." (Internal quotation marks omitted.) *State* v. *Barber*, 64 Conn. App. 659, 669–70, 781 A.2d 464, cert. denied, 258 Conn. 925, 783 A.2d 1030 (2001); see also *State* v. *Drakeford*, 202 Conn. 75, 81, 519 A.2d 1194 (1987); *State* v. *Vasquez*, 68 Conn. App. 194, 221, 792 A.2d 856 (2002). We therefore conclude that the court did not permit the state's expert witness to testify improperly as to the credibility of the victims. We also conclude that the verdict against the defendant did not constitute manifest injustice and will not lead to diminished confidence in our legal system.[9]

---

[8] The court stated, in relevant part, during its charge: "The defense case, of course, questions the credibility and the reliability of the testimony of the child witnesses. The defendant maintains that there was no sexual contact with any of the children. The defense suggests from the evidence their contention that there may have been or was coaching of the children, which the state, of course, took to rebut through the professional conclusions and observations, again, of experts and most particularly the expert, [Barrett], from Saint Francis Hospital [and Medical Center]."

[9] At this point, we take the opportunity to express our concern with certain representations of fact made by the state in its brief and used in its argument concerning plain error review of the defendant's claim. As part of the police investigation of the charges against the defendant, Peter Gigliotti, a police officer, interviewed one of the defendant's friends in the principal's office of their school. The state called the friend to testify at trial, but he was a reluctant witness and denied telling Gigliotti that the defendant had told him certain things about the victims. The state then called Gigliotti to impeach the friend's credibility on the basis of prior inconsistent conduct. After Gigliotti testified, the court gave the jury a limiting instruction that Gigliotti's testimony concerning the statements the friend had made during the investigation was admitted as evidence of prior inconsistent conduct and was not admitted for the truth of the matter. On appeal, the state has represented to this court that Gigliotti's testimony was substantive evidence and has used his testimony as such in its argument. We remind all counsel, including represen-

## II

In his second issue, the defendant claims that the court violated his constitutional right to confrontation by permitting constancy of accusation testimony. He asks this court to overrule *State* v. *Troupe*, 237 Conn. 284, 677 A.2d 917 (1996) (en banc). He also claims that the court permitted the jury to hear constancy of accusation testimony from two witnesses and that their testimony went beyond the scope of constancy of accusation testimony countenanced by *Troupe*. With respect to his request that this court overrule *Troupe*, it is not the place of intermediate courts of appeal to overrule the precedent of the jurisdiction's highest court. See *State* v. *Brown*, 73 Conn. App. 751, 756, 809 A.2d 546 (2002).

As to his other claims, we disagree that the court improperly admitted constancy of accusation testimony in violation of his right to confrontation. Assuming without deciding whether the constancy of accusation testimony of the victims' mother and Barrett went beyond the scope of *Troupe*, we cannot ignore the fact that the defendant failed to object to the testimony and, in fact, elicited further such testimony on cross-examination.[10]

---

tatives of the state, of their obligation to make fair and accurate representations of fact and law to the court.

[10] On cross-examination, defense counsel queried the victims' mother, in part, as follows:

"[Defense Counsel]: [Y]ou indicated that [R] told you what was happening up at the other end of the street. Right?

"[The Witness]: After I asked him?

"[Defense Counsel]: What were his exact words?

"[The Witness]: I asked him what happened and he told me that [the defendant] had him pull his pants down, and I asked him if that was it and he said no. I asked him what else happened, reminded him that it was important, that I loved him, I needed to know, and he told me that [the defendant] pulled his own pants down, and I asked if that was it and he said no. And he proceeded to explain to me that [the defendant] had my son [R] put his hands, [R's] hands, on [the defendant's] penis."

Again, the defendant seeks appellate review pursuant to the plain error doctrine. See Practice Book § 60-5.

The record reveals that both women testified as to the details of what the victims had told them went on between them and the defendant.[11] In *Troupe*, our Supreme Court restricted the constancy of accusation doctrine "so that a constancy of accusation witness could testify only to the fact and the timing of the victim's complaint. Even so limited, the evidence would be admissible solely for corroboration of the victim's testimony, and not for substantive purposes." (Internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 187, 777 A.2d 604 (2001).[12]

The defendant claims that the admission of the constancy of accusation testimony violated his rights under the sixth and fourteenth amendments to the United States constitution, and article first, § 8, of the constitution of Connecticut. Beyond that assertion, the defendant has not provided any analysis of his constitutional claim except to ask this court to abandon *Troupe*. The constancy of accusation doctrine, as limited in *Troupe*, recently was reaffirmed in *State* v. *Kelly*, 256 Conn. 23, 35–36, 770 A.2d 908 (2001). Furthermore, our Supreme Court has held that constancy of accusation testimony does not deny a defendant the right to confrontation. "In Connecticut, it is well established that the constancy of accusation doctrine does not violate a defendant's sixth amendment right to confrontation. *State* v. *Romero*, 59 Conn. App. 469, 480, 757 A.2d 643, cert.

---

[11] In response to the state's question whether N had disclosed incidents of abuse by the defendant, Barrett gave a lengthy and detailed description of what N had told her. Immediately thereafter, the state asked Barrett to tell the jury whether R and A had disclosed incidents of abuse by the defendant, but to do so without getting into specific detail.

The victims' mother testified about what her children had told her when they revealed the defendant's abuse.

[12] The court here instructed the jury in accordance with *Troupe*.

denied, 255 Conn. 919, 763 A.2d 1043 (2000). Our Supreme Court has ruled that this is a fundamental tenet of confrontation clause jurisprudence, namely, that the clause is not violated by admitting a declarant's out-of-court statements, *as long as the declarant is testifying as a witness and subject to full and effective cross-examination. . . . State* v. *Troupe*, [supra, 237 Conn. 292]." (Emphasis in original; internal quotation marks omitted.) *State* v. *Thompson*, 71 Conn. App. 8, 13, 799 A.2d 1126 (2002). We note that the victim declarants in this case testified and were cross-examined by the defendant.

The defendant claims that the court improperly failed to strike, sua sponte, the testimony of the harmful details given by the victims' mother and Barrett. The defendant acknowledges, however, that "when opposing counsel does not object to evidence, it is inappropriate for the trial court to assume the role of advocate and decide that the evidence should be stricken. . . . The court cannot determine if counsel has elected not to object to the evidence for strategy reasons. . . . Experienced litigators utilize the trial technique of not objecting to inadmissible evidence to avoid highlighting it in the minds of the jury. Such court involvement might interfere with defense counsel's tactical decision to avoid highlighting the testimony. When subsequent events reveal that it was an imprudent choice, however, the defendant is not entitled to turn the clock back and have [the appellate court] reverse the judgment because the trial court did not, sua sponte, strike the testimony and give the jury a cautionary instruction." (Citations omitted; internal quotation marks omitted.) *State* v. *Wragg*, 61 Conn. App. 394, 399, 764 A.2d 216 (2001). The record here discloses that although the court did not give a curative instruction as to constancy of accusation at the time of the testimony, in its final instruction

to the jury, the court informed it of the limited purpose of constancy of accusation testimony.

The state points out that the defendant not only failed to object to the constancy of accusation testimony, but that in cross-examining the two witnesses, he asked questions that caused them to elaborate on their previous testimony. Our review of the record supports that contention. We therefore conclude that it was not plain error for the court to refrain from striking, sua sponte, the constancy of accusation testimony of the victims' mother and Barrett.

### III

The defendant also claims that there was insufficient evidence to support the jury's guilty verdict as to risk of injury to A, because there was no evidence that the defendant had engaged in the prohibited conduct after October 26, 1998. We do not agree.

The long form information alleged that the defendant had committed the crime of risk of injury to a child in violation of § 53-21 (2)[13] by having contact with the intimate parts of A or by subjecting A to contact with his intimate parts in a sexual and indecent manner likely to impair the health and morals of A *on diverse dates between September, 1998 and April 24, 1999.* The foundation of the defendant's argument is A's testimony that the defendant touched him more than once, but that he could not remember when it happened or how many times. The defendant requested a judgment of acquittal as to A at the close of the state's case-in-chief and again

---

[13] General Statutes (Rev. to 1997) § 53-21 provides in relevant part: "Any person who . . . (2) has contact with the intimate parts . . . of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child, shall be guilty of a class C felony."

at the conclusion of the evidence. The court denied the motions.

The court instructed the jury that "the state must prove beyond a reasonable doubt that the . . . particular acts alleged as constituting a crime occurred within . . . diverse dates between October 26, 1998, and April 24, 1999." The court also instructed the jury that it could not convict the defendant on any count premised on acts that occurred before October 26, 1998, when the defendant became fourteen years of age.[14]

"The standard of review employed in a sufficiency of the evidence clam is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom, the [jury] could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Green*, 261 Conn. 653, 667, 804 A.2d 810 (2002).

On the basis of our review of the testimony of all three victims, we conclude that the defendant's claim of insufficient evidence with respect to A is without merit. Although A testified that he could not remember when the defendant had abused him, he did testify that it happened in "a lot" of months. Although the testimony of the victims is not explicit, the jury reasonably could have inferred from the sum of their testimony that the defendant engaged the three of them in an activity referred to as "rolling pee pees" on many occasions between October, 1998, and April, 1999. There is also evidence that A demonstrated significant behavioral changes beginning in November, 1998, such as soiling his underwear, wetting his bed and experiencing night-

---

[14] The state amended the information to allege wrongdoing on the part of the defendant after he became fourteen years of age.

mares. For those reasons, we conclude that there was sufficient evidence to convict the defendant of risk of injury to the victim, A.

## IV

The defendant's fourth claim is that the court improperly denied his motion to dismiss the three charges of risk of injury to a child because it lacked subject matter jurisdiction due to procedural irregularities in the transfer of the charges from the Juvenile Court to the regular criminal docket of the Superior Court. We are not persuaded by the defendant's argument.

The following facts are relevant to the defendant's claim. Prior to the presentation of evidence, the defendant filed a motion to dismiss the risk of injury charges, which were class C felonies,[15] on procedural grounds. The defendant claimed that some of the acts of illegal conduct alleged in the Juvenile Court were to have occurred when he was only thirteen years old.[16] In support of his motion, he argued that the state had failed to file a written motion to transfer the class C felonies and that the Juvenile Court had failed to make the requisite finding of probable cause prior to transferring those charges to the regular criminal docket. The court heard oral arguments on the motion to dismiss, and

[15] We note for informational purposes only that in 2002, the legislature amended subsection (a) of General Statutes § 53-21 to change the classification of a violation of subdivision (2) from a class C felony to a class B felony. See Public Acts 2002, No. 02-138, § 4.

[16] In the June 8, 2000 amended long form information, the state accused the defendant of the crime of risk of injury to a minor on diverse dates between September, 1998, and April 24, 1999. The defendant did not turn fourteen until October 25, 1998. The state later agreed to amend the information again to allege only those acts that occurred after the defendant's fourteenth birthday. When it ruled on the motion to dismiss, the court informed counsel that it would instruct the jury that it could only consider evidence of the crimes against the defendant that occurred between October 26, 1998, and April 24, 1999. The court charged the jury as it indicated it would.

reviewed the information, the transcript of the hearing in the Juvenile Court and the order of transfer. It, however, deferred action on the motion to dismiss until the conclusion of evidence. The court ultimately denied the motion to dismiss.

"We must first consider the standard of review where a claim is made that the court failed to grant a motion to dismiss. Our standard of review of a trial court's . . . conclusions of law in connection with a motion to dismiss is well settled. . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts. . . . Thus, our review of the trial court's ultimate legal conclusion and resulting [denial] of the motion to dismiss will be de novo." (Internal quotation marks omitted.) *State* v. *Bordeleau*, 72 Conn. App. 33, 39, 804 A.2d 231 (2002).

The governing statute is General Statutes (Rev. to 1997) § 46b-127, which provides in relevant part: "(a) The court shall automatically transfer from the docket for juvenile matters to the regular criminal docket of the Superior Court the case of any child charged with the commission of a . . . class . . . B felony . . . provided such offense was committed after such child attained the age of fourteen years. . . . (b) Upon motion of a juvenile prosecutor and approval by the court, the case of any child charged with the commission of a class C . . . felony . . . shall be transferred from the docket for juvenile matters to the regular criminal docket of the Superior Court, provided such offense was committed after such child attained the age of fourteen years and the court finds ex parte that there is probable cause to believe the child has committed the act for which he is charged. . . ."

Our review of the transcript of the proceedings before the Juvenile Court reveals the following facts. The

defendant was presented to the Juvenile Court on May 24, 1999. The defendant was represented by counsel. He was charged with three counts of sexual assault in the first degree in violation of § 53a-70[17] and three counts of risk of injury to a child in violation of § 53-21 (2). Section 53a-70 is a class B felony. See footnote 17. At that time, a violation of § 53-21 (2) was a class C felony. See footnotes 13 and 15. The state informed the Juvenile Court that this was a case classified as one for automatic transfer due to the charges of sexual assault in the first degree. After reviewing the sworn statement from the investigators and the accompanying incident reports, the Juvenile Court, *Shapiro, J.*, signed the order transferring the case to the regular criminal docket of the Superior Court pursuant to § 46b-127. In signing the transfer order, the Juvenile Court noted only that it was transferring the matter pursuant to the automatic transfer provision for class B felonies. It did not complete that portion of the form concerning mandatory transfer offenses for class C felonies.

The defendant was arraigned at the regular criminal docket that afternoon, again represented by counsel. At the arraignment, counsel explained to the court, *Byrne, J.*, that the case had been transferred to the regular court docket on the basis of the class B felony charges. At no time did defense counsel object to the transfer of the risk of injury charges to the regular criminal docket.

The transcript of the hearing on the motion to dismiss discloses that in denying the motion, the court found facts and drew conclusions of law as follows. The Juvenile Court prosecutor orally requested that the Juvenile Court review the papers for a finding of probable cause on the class C felonies and requested a signing with

[17] General Statutes (Rev. to 1997) § 53a-70 (b) provides in relevant part: "Sexual assault in the first degree is a class B felony . . . ."

reference to the transfer of the class B felonies. The trial court concluded that a request is a motion and that the language of the statute does not require that the motion be in writing. We agree.

The trial court also found that the Juvenile Court automatically had transferred the class B felonies, i.e., the charges of sexual assault in the first degree, to the regular criminal docket by signing the order of transfer. The transfer was consistent with § 46b-127 (a). With respect to the class C felonies, the trial court found that the Juvenile Court had reviewed the statement and the incident reports, which were sworn, and found probable cause for the defendant's arrest. The trial court concluded, with respect to the charges of risk of injury to a child, that the Juvenile Court's actions were consistent with § 46b-127 (b). On the basis of our review of the proceedings in the Juvenile Court and the documents before that court, we conclude that the trial court's findings and conclusions are supported by the evidence.[18]

Moreover, with respect to the defendant's argument on appeal that the transcript is ambiguous with respect to the Juvenile Court's transfer of the class B and class C felonies to the regular criminal docket, it does not appear to have been unclear to defense counsel who was present at the Juvenile Court proceeding.[19] Defense counsel took an active role in the Juvenile Court proceeding, and made special efforts to obtain the charging documents and to clarify the transfer procedure itself. As we often have stated, appellate counsel and this court cannot glean the nuances of expression, body

[18] The petition before the Juvenile Court indicates that the defendant's date of birth is October 25, 1984, and alleges three counts of risk of injury to a child to have occurred on or about April 24, 1999. The defendant was fourteen years of age at the time of the alleged misconduct.

[19] Different counsel represented the defendant in the Juvenile Court, and at the arraignment on the regular criminal docket, at trial and on appeal.

gestures and other nonverbal forms of communication that take place in preappeal proceedings. "We were not there and the flavor of the court's remarks cannot be appreciated from reading the cold black and white lines of a transcript." *Hill* v. *Hill*, 35 Conn. App. 160, 165, 644 A.2d 951, cert. denied, 231 Conn. 914, 648 A.2d 153, cert. denied, 513 U.S. 1059, 115 S. Ct. 669, 130 L. Ed. 2d 603 (1994). If counsel who was present at the proceeding did not find the procedure ambiguous or objectionable, and the record does not clearly indicate that it was, we will not reverse the decision of the court.

We therefore conclude that the court did not act improperly by denying the motion to dismiss.

## V

The defendant's fifth claim is that the court improperly permitted the state to present the testimony of the victims via videotape recordings made outside his presence. The defendant's claim is in two parts. He first argues that the court improperly concluded that the state had demonstrated by clear and convincing evidence that the victims' testimony should be videotaped outside his presence to ensure the reliability of their testimony. Second, the defendant urges this court to exercise its supervisory powers; see Practice Book § 60-2; to require in all cases that the trial court order, sua sponte, an independent psychological evaluation to determine the ability of victims of sexual abuse to provide trustworthy testimony in the presence of the alleged perpetrator.[20] We disagree with the defendant's first argument and decline to review the second one.

The following facts are relevant to the defendant's claim. In early July, 2000, the state filed a motion pursu-

[20] At trial, the defendant did not ask the court to order an independent expert evaluation of the victims' for purposes of the *Jarzbek* proceeding. See *State* v. *Jarzbek*, 204 Conn. 683, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988).

ant to General Statutes § 54-86g,[21] *State* v. *Jarzbek*, 204 Conn. 683, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988), and *State* v. *Bronson*, 55 Conn. App. 717, 729–34, 740 A.2d 458 (1999), rev'd on other grounds, 258 Conn. 42, 779 A.2d 95 (2001), asking the court for permission to videotape the testimony of the victims outside the physical presence of the defendant. The court held a *Jarzbek* hearing at which the victims' mother and therapist testified about the victims' fear of the defendant and the likelihood of their being able to testify in his presence.[22] The

---

[21] General Statutes § 54-86g (a) provides in relevant part: "In any criminal prosecution of an offense involving . . . sexual assault or abuse of a child twelve years of age or younger, the court may, upon motion of the attorney for any party, order that the testimony of the child be taken in a room other than the courtroom in the presence and under the supervision of the trial judge hearing the matter . . . . [T]he court may order the defendant excluded from the room or screened from the sight and hearing of the child only if the state proves, by clear and convincing evidence, that the child would be so intimidated, or otherwise inhibited, by the physical presence of the defendant that a compelling need exists to take the testimony of the child outside the physical presence of the defendant in order to insure the reliability of such testimony. . . ."

[22] Following the direct and cross-examination of the victims' therapist by the state and defense counsel, the court asked the therapist specific questions about the victims' ability to testify:

"The Court: It's your opinion that [A], in the presence of the defendant, in court, would not testify at all?

"[The Witness]: I don't think he would be able to.

"The Court: If you would just elaborate on that.

\*\*\*

"[The Witness]: I think both by virtue of his age and the age that he was during the alleged abuse, whatever—and the amount of time that has passed, I think those are issues that make it difficult for him to even recall. But he also is extremely afraid and embarrassed, are his words to me. And he said, just as recently as Thursday, that he would not be able to do it. He's also having nightmares about being trapped in the Davis house; that indicates to me that there's a lot of internal fear.

"The Court: And you said that [R], who is the oldest, and as I understand it, he's nine years old at the present time?

"[The Witness]: At the present time, yes.

"The Court: And you said that you felt he would have the most difficulty even though he was older, as I understand it. Is that correct?

"[The Witness]: Certainly, more difficult than [N]. And if we're presuming

defendant did not call any witnesses to testify. The court granted the motion. The court concluded that the state had proven by clear and convincing evidence the compelling need to exclude the defendant's physical presence from the room during the videotaping of the victims' testimony. The court also concluded that the victims would be so intimidated, or otherwise inhibited, by the presence of the defendant that the trustworthiness of their testimony would be seriously called into question. On appeal, the defendant argues that the testimony of the victims' mother and their therapist was focused on the victims' welfare rather than on the reliability of their testimony.

---

that [A] is not able to testify at all then, yes, he would have—

"The Court: And that's because it's your assessment that he has difficulty moderating his behavior?

"[The Witness]: [R] is a very extreme child. He has some other difficulties around hyperactivity and attention deficit that play into his ability to be focused. But we've seen escalation in his behavior, lately, where he goes off. He just gets so overwhelmed and can't relax himself or pull himself back. And he gets into almost like a trance state where he's crying and screaming, and he won't let anyone console him . . . . But he gets himself worked into a frenzy, basically, and has a very difficult time pulling himself back, and it just sort of has to work itself through and then he can kind of relax again.

"The Court: So, you said that, in your opinion, he would probably either say nothing or—

"[The Witness]: I think those are the two extremes; that he would either completely shut down or become very worked up and upset.

"The Court: You say that the worst scenario or a scenario, at least, might be that none of the children would testify and, even if they did, be very traumatized? Is that what you're saying?

"[The Witness]: Yeah, it is traumatic for any child to testify, and I think what I said is that their responses would be minimal; that they would maybe give a 'yes' or 'no' or a very shortened answer. I don't think any of the children would be able to elaborate in much detail about the circumstances.

"The Court: And is that because of the defendant's presence or more likely because of the defendant's presence?

"[The Witness]: I think it's more likely in the defendant's presence because of the fear they have of him and the family. I guess what my sense is, that the safer the environment, the more likely they're going to be able to say something. The more frightened they feel, the less their mental process is going to allow them to say much of anything."

"Pursuant to § 54-86g, the trial court is afforded the discretion necessary to grant a motion to have a child victim testify outside of the presence of the defendant. The [ability] of a witness [to testify reliably] is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear case of abuse or of some error in law. . . . *State* v. *Marquis*, 241 Conn. 823, 836, 699 A.2d 893 (1997)." (Internal quotation marks omitted.) *State* v. *Bronson*, 258 Conn. 42, 49–50, 779 A.2d 95 (2001). In *Jarzbek*, our Supreme Court mandated "a case-by-case analysis, whereby a trial court must balance the individual defendant's right of confrontation against the interest of the state in obtaining reliable testimony from the particular minor victim in question." (Internal quotation marks omitted.) Id., 50.

On the basis of our review of the *Jarzbek* hearing in this matter, we conclude that the court properly determined that the state had proven by clear and convincing evidence that the victims should testify outside the defendant's presence and that they were so intimidated, or otherwise inhibited, by his presence that the reliability of their testimony would be called into question. The court weighed the competing interests articulated in *Jarzbek* and its progeny, and was mindful that the paramount concern in reaching its conclusion was the trustworthiness of the victims' testimony rather than how testifying in the defendant's presence would affect them personally.

We decline to review the defendant's argument that this court should exercise its supervisory powers and require all courts to order, sua sponte, independent expert examination of child victims of sexual abuse to determine whether they are able to provide reliable testimony in the defendant's presence. Our Supreme Court has articulated the standard for independent expert evaluation of a child victim. "To this end, the trial court has the discretion to order an expert's exami-

nation or to grant a party's request for such an examination. In *State* v. *Marquis*, [supra, 241 Conn. 836, our Supreme Court] held that a trial court has the discretion to order that a child witness be examined by an expert witness before deciding whether to grant the state's *Jarzbek* motion." *State* v. *Bronson*, supra, 258 Conn. 50. As this court has stated many times, and as we concluded previously, it is not the province of an intermediate appellate court to overturn the precedent of the highest court in the jurisdiction.

## VI

The defendant's last claim is that the court improperly charged the jury as to reasonable doubt and, thus, lowered the state's burden of proof, thereby depriving him of his constitutional right to a fair trial. The defendant did not file a request to charge and did not object to the charge given by the court. He therefore seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The defendant cannot prevail under *Golding* because the claimed constitutional violation did not clearly exist.

In his brief on appeal, the defendant has provided a laundry list of nine phrases the court used to define reasonable doubt that he claims lowered the state's burden of proof. The defendant provided a footnote to each phrase citing a case decided by our Supreme Court in which the phrase was held to pass constitutional muster. Nonetheless, the defendant requests review because, in his opinion, the phrases dilute the state's burden of proof. As to the defendant's claims with respect to each of those phrases, our Supreme Court has spoken, and we will not address them. See *State* v. *Brown*, supra, 73 Conn. App. 756.

The defendant's primary objection to the court's instruction is the court's description that a reasonable doubt is one that is honestly entertained after a fair

comparison and careful examination of the entire evidence. He claims that by inviting the jury to compare the evidence presented by both sides, the court invited the jury to balance or weigh the evidence presented and that weighing evidence is dangerous in the criminal context because it evokes the preponderance of the evidence standard.[23] We disagree.

"Our Supreme Court's standard of review regarding claims of improper jury instruction is well established. [A] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Dubose*, 75 Conn. App. 163, 168–69, 815 A.2d 213, cert. denied, 263 Conn. 909, 819 A.2d 841 (2003).

On the basis of our review of the jury instructions as a whole, we find no language that would mislead the jury. "Also, a 'microscopic search for possible error'; [*State* v. *Walsh*, 67 Conn. App. 776, 798, 789 A.2d 1031, cert. denied, 260 Conn. 906, 795 A.2d 546 (2002)]; although not necessary, fails to reveal any language that

---

[23] In his reply brief, the defendant also argues that a charge that invites the jury to compare the evidence has no place in criminal law because the burden of proof is on the state, and the defendant is not required to put on any evidence. Although we agree that a criminal defendant is not required to put on any evidence, the defendant here called a number of witnesses to testify and testified on his behalf as well.

has not previously been upheld as proper. See . . . *State* v. *Anderson*, 65 Conn. App. 672, 686, 783 A.2d 517 (2001) ('court's instruction that "[reasonable doubt] is a doubt that is honestly entertained and is reasonable in light of the evidence after a fair comparison and careful examination of the entire evidence presented in the case" ' has consistently been upheld)." (Citations omitted.) *State* v. *Mazzeo*, 74 Conn. App. 430, 441–42, 811 A.2d 775, cert. denied, 263 Conn. 910, 821 A.2d 767 (2003).

The judgment is affirmed.

In this opinion the other judges concurred.