******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* SAMUEL M.*
(AC 36789)

DiPentima, C. J., and Sheldon and Sullivan, Js.

*Argued December 1, 2014—officially released August 18, 2015*

(Appeal from Superior Court, judicial district of Windham, geographical area number eleven, Seeley, J.)

*Bryan P. Fiengo*, with whom, on the brief, was *Michael A. Blanchard*, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, and *Andrew J. Slitt*, assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Samuel M., appeals from the judgment of conviction rendered against him on two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2) and one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (2) in connection with a series of incidents involving his minor cousin, J. The incidents were alleged to have occurred "on or about June, 2009," when the defendant was fourteen years old and J was ten years old. Based upon the classifications of the charged offenses and the state's allegation that the defendant had committed them after reaching the age of fourteen, the defendant's case was transferred from the docket for juvenile matters (juvenile docket) to the regular criminal docket pursuant to General Statutes § 46b-127 (a) (1).[1] As a result of the transfer, the defendant was tried, convicted and sentenced as an adult.

On appeal, the defendant claims that (1) the evidence was insufficient to support his conviction of any of the charged offenses due to severe inconsistencies in J's testimony at trial; and (2) the trial court erred in denying his motion to dismiss the amended information, under which he was prosecuted as an adult, and to transfer his case to the juvenile docket, based upon the state's failure to prove that he committed any of the offenses of which he was convicted after attaining the age of fourteen.[2] We disagree with the defendant that the evidence was insufficient to support his conviction due to alleged inconsistencies in J's trial testimony. We agree with the defendant, however, that the state failed to prove that he was at least fourteen years old at the time of the offenses, and thus conclude that the court improperly denied his motion to dismiss the amended information and to transfer the matter to the juvenile docket.

The following facts and procedural history are relevant to this appeal. The defendant and J are first cousins who are approximately four years apart in age.[3] The defendant, who is the older of the two boys, was born on September 17, 1994. J was born on December 31, 1998.[4] At the time of the alleged assaults, J's and the defendant's families resided across the street from one another in Windham County. The grandparents of J and the defendant, R and G,[5] lived on the same street and within walking distance of the two homes. During the school year, J and his older brother spent Tuesday and Thursday afternoons at their grandparents' house while their parents were at work. On the days that the defendant did not have basketball or baseball practice after school, he spent the afternoons at his grandparents' house as well, along with his three siblings. Because of their close proximity, the families frequently met for dinner on Sundays and occasionally vacationed together. The children also played together after school

and during the summer months.

In the second to last week of June, 2009, J's mother, S, woke up early one morning, at about 5 a.m., and went downstairs to gather her things to prepare to go to work. At that time, she observed that her cell phone, which had been placed on the charger in the living room, appeared to be lit up as if it had recently been in use. Given the early morning hour, this struck her as odd and prompted her to look through the contents of the cell phone. Upon doing so, she discovered a text message between J and one of his friends. S continued to search the contents of her cell phone and discovered a photograph of J's penis. S immediately woke J, who was still sleeping, and demanded that he explain the photograph. J admitted that he had taken the photograph of his penis, claiming that he had done so at the defendant's request.[6] Upon further questioning, J disclosed that there had been sexual activity between him and the defendant, but he did not say when the activity had occurred. Following this conversation, S terminated all contact between J and the defendant.

Several weeks later, in September, 2009, S convened a family meeting to make J's grandparents, R and G, and the defendant's family aware of what had taken place. J's aunt also attended the meeting, and at that time she spoke privately with J concerning his allegations against the defendant. J confirmed to his aunt that there had been activity of a "sexual nature" between him and the defendant.

S did not report the matter to the police. Instead, she arranged for J to see a therapist. More than one year later, in August, 2010, J's therapist reported the alleged sexual abuse to the Department of Children and Families. The department then referred the matter to the state police. Detective Patrick Dragon, of the eastern district major crime squad, was assigned to investigate the referral. Psychologist Mary Cheyne conducted a video recorded forensic interview of J.[7] During the interview, J, who was then eleven years old, described seven separate incidents involving sexual contact initiated by the defendant. According to J, the sexual abuse began "around my end of my fourth grade year." The incidents were alleged to have occurred on Tuesday and Thursday afternoons when J and the defendant were in their grandparents' care but out of their sight and immediate supervision. J recalled that on five occasions, he and the defendant performed fellatio on one another. When asked to describe the incidents, J stated that the defendant "would make me suck his penis first, and then, like, to pay back, he would suck mine." On two other occasions J and the defendant allegedly performed anal sex on one another. On each occasion, J claimed the defendant had forced him to submit to the sexual acts by threatening him with a baseball bat.[8] According to J, "[the defendant] said, if you tell anyone, I'm going

to hurt you . . . so, me, only being in fourth grade, and him, being, like, what, twelve, no, like, thirteen, actually, I believed him."

At the conclusion of the interview, Cheyne attempted to get clarification about the timing of the assaults.[9] J stated that the first incident occurred in the autumn of his fourth grade year and that the sexual activity continued "for a whole year" until the "first day of autumn" of his fifth grade year. When asked which month he thought the last incident occurred, J stated that he believed it was October "because in the forest the leaves were starting to change and fall off." Near the conclusion of the interview, J stated that the activity had occurred over a span of three months in the middle of his fourth grade year.

On the basis of these facts and interviews with members of J's family, a juvenile arrest warrant for the defendant was issued on December 2, 2011, charging him with sexual assault in the first degree and risk of injury to a child. The juvenile arrest warrant and juvenile summons and complaint alleged that the date of the offense was "on or about June, 2009," which corresponded with S's discovery of the photograph on her cell phone. On January 10, 2012, the defendant's case was transferred from the juvenile docket to the regular criminal docket pursuant to the mandatory transfer provision, § 46b-127 (a).[10] The state subsequently filed an amended information charging the defendant with fourteen counts of sexual assault in the first degree and one count of risk of injury to a child in connection with seven separate incidents. Seven counts alleged sexual assault by use of force in violation of § 53a-70 (a) (1). Seven counts alleged sexual assault of a victim under the age of thirteen when the defendant was more than two years older than the victim in violation of § 53a-70 (a) (2). The fifteenth count charged the defendant with risk of injury to a child in violation of § 53-21 (a) (2), alleging that the defendant had contact with the intimate parts of a child under the age of sixteen years. The state alleged that each of the seven incidents had occurred on or about June, 2009. The state alleged that the defendant had illegal contact with J's intimate parts "on or about divers dates from in June, 2009 . . . ."

The defendant pleaded not guilty to the charges and elected a jury trial. The defendant's trial commenced on July 11, 2013, and concluded on July 17, 2013. The state called six witnesses in its case-in-chief and rebuttal case. The substantive evidence against the defendant was limited to J's testimony.[11] J, who was fourteen years old at the time of trial, testified that in June, 2009, he was attending middle school. He testified as to seven incidents of sexual assault that had taken place when he was "nine or ten" years old, that occurred "maybe a month apart," on Tuesday and Thursday afternoons. On redirect examination, J stated that he could not

recall with any certainty when the incidents occurred.

At the close of the state's case-in-chief, the defendant moved the court to dismiss the charges or to render a judgment of acquittal on the ground that the state had failed to establish a time frame for the assaults. Defense counsel argued: "[It is] problematic . . . the lack of a time frame . . . . Now, in our opinion that becomes important because while the state has alleged that June of 2009 is an operative time, there is some testimony that it happened somewhere when he was in fourth grade, but there [has] been no evidence put before this court as to when [J] was in fact in fourth grade. . . . [T]he best information that I recall is that when [J] was talking about particular ages at about which time this happened, it would have been either nine or ten. Now, with his birthday being in 1998, he's nine in 2007 and ten in 2008, that poses a problematic issue . . . because of the fact that up until September [17] of 2008, [the defendant] was a minor and not subject to the transfer statute, which kicked in when he [attained] the age of fourteen. Since there's not a sufficient enough clarity as to the timing of this particular incident, Your Honor, it is—it could be an absolute situation, this . . . matter should not be before this court and, as such, this matter should be dismissed."

The defendant also argued that acquittal was mandated because of the factual inconsistencies as to timing on the basis of facts adduced through the testimony of the state's witnesses and the time frame alleged as a predicate for the charges.

In response, the state argued, inter alia, that "we're talking about details. . . . The state's evidence was presented not just by the—by [J], but by [S] and by his aunt. The state is not required to establish with precision . . . when the crime occurred. The descripting term of on or about is there for a reason. The court's instructions to the jury are [going to] explain that. I believe that the state is not required to make that precise time known to the jury and, again, the—talking about details that a child is attempting to remember about something that happened four years ago." The state averred that S's testimony concerning her discovery of the photograph of J's penis on her cell phone and J's disclosure, in the second to last week of June "put the time frame into proper context." The court denied the motion for a judgment of acquittal, but reserved judgment on it only as to counts eleven and twelve. At the close of evidence the court rendered a judgment of acquittal on two counts on other grounds.[12] The court did not directly address the defendant's motion to dismiss, stating, "I do note . . . your arguments on the time frame issue. I do not think that that matter is part of a judgment of acquittal argument for [these] purposes. It may be another argument or another motion." The defendant did not further pursue the issue

at that time.

The defendant called six witnesses in his defense. Two of the defendant's witnesses testified concerning the time frame of the alleged assaults. The defendant's father testified as to alibi evidence concerning the defendant's after-school sports schedule, which included basketball practices scheduled on Tuesday and Thursday afternoons in the 2008–2009 school year. The defendant and J's grandmother, R, who watched the boys after school on the days the assaults allegedly took place, testified that she was diagnosed with cancer on June 13, 2008, and underwent surgery and, thus, could not "recall ever watching them all—not all the time" beyond July, 2008.[13]

At the close of evidence, on July 16, 2013, the defendant moved for a judgment of acquittal, arguing, inter alia, that J's testimony had failed to establish a time frame for the charged offenses that conformed to the dates alleged in the information.[14] On that score, the defendant argued that "with all [of] the divergent evidence" as to timing, the jury had no reasonable basis from which to infer that the incidents occurred on or about June, 2009. The court denied the defendant's motion for a judgment of acquittal. At that time, the court also considered and summarily denied the defendant's motion to transfer, predicated on the same argument, moving the court to transfer the defendant's case to the juvenile docket pursuant to § 46b-127 (a) (2)[15] on the ground that the court lacked jurisdiction over him.[16]

In the court's final charge to the jury, the counts were identified by the location of the incident, and each count was alleged to have occurred on or about June, 2009. The jury was instructed: "[T]he state does not have to prove the exact date of the offense charged beyond a reasonable doubt, only that the alleged acts as charged occurred on or about divers dates in June, 2009."

The jury found the defendant guilty of three counts of first degree sexual assault in violation of § 53a-70 (a) (2), based on the more than two year age difference between the defendant and J, and one count of risk of injury to a child in violation of § 53-21 (a) (2), based on illegal contact with J's intimate parts. The jury found the defendant not guilty of three counts of sexual assault in violation of § 53a-70 (a) (2) and all six remaining counts of sexual assault by use of force in violation of § 53a-70 (a) (1).

Following the jury's verdict, the defendant filed a "motion to dismiss information and motion to transfer," and a motion for a judgment of acquittal, contending that the state's failure to establish an operative time frame for the offenses mandated either that the case be dismissed for lack of jurisdiction and transferred back to the juvenile docket or that the defendant be acquitted of the charges. The court granted the defen-

dant's motion for a judgment of acquittal on one count of sexual assault in the first degree. On each of the three counts of which the defendant was found guilty, the court imposed the mandatory minimum five year sentence, to run concurrently, plus five years special parole, with lifetime sex offender registration.[17] The court denied the defendant's motion to dismiss. This appeal followed.

I

We first address the defendant's claim that J's testimony cannot support the conviction. More particularly, the defendant directs our attention to various portions of J's testimony, which, he maintains, are "so fantastic that one must reach a conclusion of fabrication." He further claims that the split verdict demonstrates that the jury compromised its verdict. This claim merits little discussion.

"The standard of appellate review of a denial of a motion for a judgment of acquittal has been settled by judicial decision. . . . The issue to be determined is whether the jury [reasonably could have] concluded, from the facts established and the reasonable inferences which could be drawn from those facts, that the cumulative effect was to establish guilt beyond a reasonable doubt. . . . The facts and the reasonable inferences stemming from the facts must be given a construction most favorable to sustaining the jury's verdict. . . . It is established case law that when a defendant challenges the sufficiency of the evidence, we apply a twofold test. We first review the evidence . . . in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn . . . the jury [reasonably could] have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . ." (Internal quotation marks omitted.) *State* v. *Turner*, 133 Conn. App. 812, 842–43, 37 A.3d 183, cert. denied, 304 Conn. 929, 42 A.3d 390 (2012).

As this court has noted, "it is not the province of appellate courts to make determinations of credibility, as that is the right and purpose of the jury." *State* v. *Caracoglia*, 95 Conn. App. 95, 128, 895 A.2d 810, cert. denied, 278 Conn. 922, 901 A.2d 1222 (2006). The jury was free to credit or reject J's testimony and, indeed, the jury's verdict demonstrates that it did reject a vast portion of J's testimony. Moreover, contrary to the defendant's contention, the jury's determination that the defendant did not commit some of the alleged crimes does not mandate a similar conclusion as to the remaining charges. See *State* v. *Arroyo*, 292 Conn. 558, 585, 973 A.2d 1254 (2009) (our law permits factually and logically inconsistent verdicts), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010). The evidence was sufficient to sustain the defendant's con-

victions.

## II

### A

The defendant next claims that the state's failure to prove that the crimes occurred in the time frame alleged, after he had attained the age of fourteen, left the trial court without jurisdiction and, thus, the information should be dismissed and the matter transferred to the juvenile docket for further proceedings. We agree.

To fully understand the defendant's claim on appeal, an examination of the relevant statutory framework is necessary. The Superior Court for Juvenile Matters has exclusive original jurisdiction over all proceedings concerning delinquent children[18] subject to certain exceptions that have been carved out under the juvenile transfer statute, § 46b-127.[19] "The current revision of § 46b-127 provides for three types of transfers of a case that charges a juvenile with an offense: (1) mandatory transfers from the docket for juvenile matters to the regular criminal docket of the Superior Court (mandatory transfer provision); General Statutes (Supp. 2014) § 46b-127 (a); (2) discretionary transfers from the docket for juvenile matters to the regular criminal docket of the Superior Court (discretionary transfer provision); General Statutes (Supp. 2014) § 46b-127 (b); and (3) transfers of cases of youths age sixteen or seventeen from the youthful offender docket, regular criminal docket of the Superior Court or any docket for the presentment of defendants in motor vehicle matters, to the docket for juvenile matters (youthful offender transfer provision). General Statutes (Supp. 2014) § 46b-127 (f)." (Footnote omitted.) *In re Tyriq T.*, 313 Conn. 99, 105–106, 96 A.3d 494 (2014).

This case concerns the mandatory transfer provision, § 46b-127 (a). Pursuant to § 46b-127 (a), the transfer of a child to the regular criminal docket is mandatory if the child is charged with having committed a class A or class B felony after he or she has attained the age of fourteen. The child's age on the date of the offense, as alleged in the state's information, determines the child's eligibility to be prosecuted as an adult. See General Statutes § 46b-127 (a). If probable cause has been found that the child committed the offense, the case is transferred to the adult docket by operation of law.[20] "Upon the effectuation of the transfer, such child shall stand trial and be sentenced, if convicted, as if such child were eighteen years of age. . . . If the action is dismissed or nolled or if such child is found not guilty of the charge for which he was transferred . . . the child shall resume such child's status as a juvenile until such child attains the age of eighteen years." General Statutes § 46b-127 (c).

Against this background, the defendant argues that under § 46b-127 (a), mandatory transfer is authorized

only if the commission of the offense occurred after the child attained the age of fourteen. Accordingly, the defendant claims that his age at the time of the offense is a jurisdictional fact that served to trigger criminal proceedings on the adult docket and the criminal penalties that follow, which, in his case, include felony convictions of serious sexual offenses and lifetime registration as a sex offender. Given the significantly enhanced consequences related to his age, he argues, there must be proof to establish beyond a reasonable doubt that the crimes occurred after his fourteenth birthday. On this score, the defendant contends that the state offered "exceedingly vague and nebulous" testimony to support its allegation that the crimes occurred "on or about June, 2009 . . . ." Because our juvenile statutes contain no provision for the transfer of children under the age of fourteen, he argues, the court lacked jurisdiction and, thus, erred in denying his motion to dismiss and to transfer.

The state argues that the defendant's jurisdictional claim must fail because as a constitutional court of general jurisdiction, the court had the authority to adjudicate the offenses at issue. The state further argues that the uncontested evidence at trial established that the defendant was fourteen years old at the time of the commission of the crimes.

The state is correct that in 1978, the Court of Common Pleas and Juvenile Court were merged with the Superior Court. See General Statutes § 51-164s. Thus, "[t]his state has a unified court system. . . . [A]ll criminal and civil matters, including juvenile matters, fall within the subject matter jurisdiction of the Superior Court. Juvenile matters are comprised of a civil session and a criminal session; all proceedings concerning delinquent children are heard in the criminal session for juvenile matters. General Statutes § 46b-121 (a). For ease of reference, we refer to the Superior Court for juvenile matters as juvenile court and to the Superior Court for regular, or adult, criminal matters as criminal court." *State* v. *Ledbetter*, 263 Conn. 1, 4–5 n.9, 818 A.2d 1 (2003). As a result of our unified court system, "[r]ather than implicating subject matter jurisdiction, issues relating to transfers between the juvenile and the regular criminal docket involve considerations that are analogous to those of the law of venue." *State* v. *Kelley*, 206 Conn. 323, 332, 537 A.2d 483 (1988); accord *In re Matthew F.*, 297 Conn. 673, 691, 4 A.3d 248 (2010).

Although "General Statutes § 51-164s . . . merg[ed] the Juvenile Court and the Superior Court, the legislature has preserved a separate system for the disposition of cases involving juveniles accused of wrongdoing." (Internal quotation marks omitted.) *In re Prudencio O.*, 229 Conn. 691, 696, 643 A.2d 265 (1994); see also General Statutes § 46b-121.[21] General Statutes § 46b-145 provides in relevant part that "[n]o child shall be prose-

cuted for an offense before the regular criminal docket of the Superior Court except as provided in section 46b-127. . . ." Thus, "[t]he General Assembly . . . has expressed a preference for shielding children from criminal liability except in clearly circumscribed situations." *State* v. *Torres*, 206 Conn. 346, 360, 538 A.2d 185 (1988).

Although the same criminal statutes apply to adult and juvenile criminal matters, juvenile matters are governed by different procedures.[22] The difference in treatment accorded to children accused of wrongdoing attaches the moment the child enters the juvenile justice system. Id. "Whenever a child is brought before a judge of the Superior Court, such judge shall immediately have the case proceeded upon as a juvenile matter. . . ." General Statutes § 46b-133 (b). The process that ensues thereafter reflects the goal of the juvenile justice system, which is not criminal punishment, but rather, "individualized supervision, care, accountability and treatment . . . ." General Statutes § 46b-121h; see also *Kent* v. *United States*, 383 U.S. 541, 554, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966) ("The objective of juvenile court proceedings is to determin[e] the needs of the child and of society rather than adjudicat[e] criminal conduct. The objectives are to provide measures of guidance and rehabilitation . . . not to fix criminal responsibility, guilt and punishment."). The measures employed to achieve this aim and to protect the privacy of the child include a predisposition investigation by a juvenile probation officer (General Statutes § 46b-134); the separation of juvenile matters from other business of the superior court whenever practicable; (General Statutes § 46b-121 [a]); and confidential proceedings (General Statutes § 46b-121 [b]).

Moreover, where the juvenile court determines that the juvenile offender has violated a criminal statute, the result is a conviction of delinquency rather than a felony conviction. General Statutes §§ 46b-140 and 46b-141; see also *State* v. *Ledbetter*, supra, 263 Conn. 14 ("[a] delinquency petition does not charge a child with having committed a crime and . . . adjudication of a juvenile offense is not a conviction . . . and does not permit the imposition of criminal sanctions" [internal quotation marks omitted]). A finding that the child has committed a delinquent act, unlike a felony conviction, does not carry with it the loss of civil rights and privileges. In addition, the sanctions that are imposed as a result of conviction are less severe in cases of delinquency. Juvenile incarceration takes place at the Juvenile Training School; General Statutes § 46b-140 (j); the purpose of which is to rehabilitate and educate the child, rather than to exact criminal punishment. The term of sentence for a juvenile is also restricted by statute. See General Statutes § 46b-141.

Finally, a juvenile offender is given a significant bene-

fit not readily available to adults who have been convicted of violating the law—upon discharge from the juvenile justice system, the juvenile is afforded a clean slate. Juvenile matters are sealed to all but the victim, with some limited exceptions for public administration, and dispositional orders are not available to the public. General Statutes § 46b-124. A juvenile offender's long-term anonymity is equally preserved, as he may petition for the erasure of records. General Statutes § 46b-146.

Observing the differences in procedure attendant to juvenile and adult matters and noting the clear legislative intent to shield children who do not meet the statutory criteria under § 46b-145 from the less forgiving adult adjudication and sentencing, our Supreme Court, in *State* v. *Torres*, supra, 206 Conn. 346, held that a defendant transferred to the regular criminal docket under § 46b-127 was entitled to be returned to the docket for juvenile matters on his motion to dismiss once the court determined that there was no probable cause for the murder charge that prompted his transfer. Id., 348; but see *State* v. *Cuffee*, 32 Conn. App. 759, 763–64, 630 A.2d 621 (1993) (upholding conviction where defendant was transferred on murder charge, and requested jury instruction on lesser included offense and was convicted of that offense). Notably, the court in *Torres* declined to address "questions about the validity of a subsequent conviction . . . as a result of a full trial or a plea of guilty."[23] *State* v. *Torres*, supra, 360 n.17.

In *State* v. *Angel C.*, 245 Conn. 93, 715 A.2d 652 (1998), our Supreme Court again considered the mandatory transfer provision under § 46b-127 (a), addressing constitutional challenges to the then newly enacted legislation eliminating the defendant's right to a hearing prior to transfer to the adult court. Our Supreme Court held that the statute did not violate procedural or substantive due process.[24] In so deciding, the court noted that the legislature had taken steps to ensure that the protections conferred on juveniles are not lost if the child is transferred pursuant to § 46b-127 (a) and it is later determined that the child should not have been subject to the transfer statute. Id., 121–22. "If charges against a juvenile who was transferred to the criminal docket pursuant to § 46b-127 (a) are dismissed, § 46b-127 (c) mandates that the juvenile shall resume his or her juvenile status." (Footnote omitted.) Id., 126.

In light of the statutory framework and the relevant authorities, we conclude that if the statutory age criteria defining the grounds for transfer under § 46b-127 (a) cease to be met, the defendant may not be prosecuted, convicted, and sentenced as an adult. The law precludes the adult criminal prosecution of children under the age of fourteen. See General Statutes §§ 46b-145 and 46b-127 (a). "It is clear that what in an adult would be a crime, yet when done by a juvenile is a delinquency

and punishable not as in the case of an adult but in a manner provided in the Juvenile Court Act." (Internal quotation marks omitted.) *State* v. *Elbert*, 115 Conn. 589, 162 A. 769 (1932). A defendant subject to the mandatory transfer provision may contest the trial court's authority over him and upon the court's granting of his motion to dismiss resume his juvenile status. See General Statutes § 46b-127 (c). "To determine otherwise would contravene the legislature's intent that [juveniles] accused of wrongdoing be accorded different treatment from adults." (Internal quotation marks omitted.) *In re Jan Carlos D.*, 297 Conn. 16, 25–26, 997 A.2d 471 (2010), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 747–48, 754, 91 A.3d 862 (2014); *State* v. *Torres*, supra, 206 Conn. 361.

## B

We next turn to the defendant's related contention that the defendant's age at the time of the offense, as a "jurisdictional prerequisite" to be tried and sentenced as an adult, must be established by proof beyond a reasonable doubt. As noted, the crux of the defendant's argument is that the state's assertion that he was over the age of fourteen at the time of the crimes has significant consequences, including criminal felony convictions, lengthy incarceration with an adult inmate population, and lifetime registration as a sex offender.[25] "The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction." *In re Winship*, 397 U.S. 358, 363, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). We agree with the defendant that the gravity of an adult criminal conviction, as compared to the penalty that attaches in the adjudication of a juvenile, is substantial.[26] The punishment meted out for the criminal wrongdoing of adults is imposed on the theory that such punishment has a deterrent effect. Historically, however, there has been an acknowledgment in this state, mirrored in the common law, that children are "incapable of forming criminal intent and not of an age where the threat of punishment could serve as a deterrent." 2 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 9.6 (a); see *In re Tyvonne M.*, 211 Conn. 151, 156, 558 A.2d 661 (1989).

At common law, an offender's age was, in some instances, the determinative factor between guilt and innocence. For children under the age of seven, there was a conclusive presumption that such offenders were incapable of committing a crime. *State* v. *Elbert*, supra, 115 Conn. 593. Between the ages of seven and fourteen, there was a rebuttable presumption that the child was incapable of committing a crime. Id. Children in this age bracket were presumed not to have the capacity to discern between good and evil. 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 368.

The state was thus tasked with overcoming the presumption by proving the child's "vicious will"; id., p. 367; and ability to understand the wrongfulness of his conduct. Id., pp. 367–68. Those fourteen and over, however, were subject to the same criminal laws as adults and could be held criminally responsible. *In re Tyvonne M.*, supra, 211 Conn. 156; see 4 W. Blackstone Commentaries on the Laws of England (1769) pp. 23–24; 3 E. Coke, Institutes of the Laws of England (Thomas ed. 1826) p. 571; W. LaFave & A. Scott, Criminal Law (1972) § 46, p. 351; 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) p. 361. "The law recognized that while a child may have actually intended to perform a criminal act, children in general could not reasonably be presumed capable of differentiating right from wrong. . . . The presumptions of incapacity were created to avoid punishing those who, because of age, could not appreciate the moral dimensions of their behavior, and for whom the threat of punishment would not act as a deterrent." (Citation omitted.) *In re Tyvonne M.*, supra, 156.

In *State* v. *Elbert*, supra, 115 Conn. 589, Chief Justice Maltbie, one of the chief proponents of juvenile reform at the time, explained that the establishment of our juvenile justice system and the legislature's authority to preclude the criminal adult prosecution of offenders falling under a certain age pursuant to our juvenile statutes corresponded to the rule at common law. "The age of one who has committed a particular act forbidden by law has always been an element necessary to make that act a crime." Id., 593; see also 2 Z. Swift, supra, p. 361.

The establishment of the juvenile justice system and the informal and rehabilitative treatment of children falling below the age designated by statute to be subject to adult penalties negated the utility and, thus, the need for the infancy defense in juvenile delinquency proceedings. See *In re Tyvonne M.*, supra, 211 Conn. 161. "[T]he child found delinquent is not perceived as a criminal guilty of one or more offenses, but rather as a child in need of guidance and rehabilitative services. In effect, the statutes regulating juvenile misconduct represent a system-wide displacement of the common law." (Internal quotation marks omitted.) Id.

It stands to reason, however, that when the state seeks to prosecute and convict a child for felony offenses, the state bears the burden of establishing the child's eligibility to be tried and sentenced as an adult. Thus, to be punishable as a criminal offense in adult court, the offense must be shown to have occurred on or after the defendant's fourteenth birthday, and this must be proved beyond a reasonable doubt.[27]

C

In the present case, then, the issue is whether the

court erred in denying the defendant's motion to dismiss, in which he claimed that the court lacked the authority to convict and sentence him as an adult. This court reviews the denial of a motion to dismiss de novo. *State* v. *Davis*, 76 Conn. App. 653, 669, 820 A.2d 1122 (2003). As indicated previously, the defendant raised the jurisdictional question concerning his age three times: at the close of the state's case-in-chief, at the close of evidence, and postverdict.[28] The court permitted the parties to brief and argue the issue on October 15, 2013, the date of the defendant's sentencing. At that time, the defendant also filed a motion for a judgment of acquittal, in support of which he argued that the state had failed to prove that the incidents in connection with which he had been found guilty had occurred on or about June, 2009. At the start of the hearing, the court noted that the defendant's motions presented interrelated claims with respect to the timing of the offenses. The court orally ruled on both motions, granting in part and denying in part the motion for a judgment of acquittal, and denying the motion to dismiss. With respect to the motion for a judgment of acquittal, the court determined that the evidence reasonably permitted a jury finding that two of the incidents had occurred on or about June, 2009. The court concluded, however, that the evidence did not reasonably permit a jury finding that one of the incidents had occurred during that time period and, thus, it acquitted the defendant on that count. The court denied the defendant's motion to dismiss without further elaboration. On the basis of the record, it is evident that in ruling on the defendant's motion to dismiss, the court relied on its reasoning in denying the motion for a judgment of acquittal as to the three counts.

Because the time frame of each of the incidents is central to the trial court's ruling and the defendant's claim on appeal, we first turn our focus to J's testimony describing the assaults. For ease of reference in the discussion of the defendant's claim, we set forth the corresponding counts as identified in the court's jury instructions.

Counts One and Two: Behind Grandparents' Barn

J testified that in June, 2009, he was in middle school. On Tuesday and Thursday afternoons, he took a school bus home to his grandparents' house after school. With respect to the first incident, the prosecutor adduced evidence that "there [came] a time when something happened with [the defendant]." J testified that he and the defendant were playing behind the barn on their grandparents' property. The defendant asked J if he wanted to play the "psychiatrist game." J agreed to play. The defendant then pulled down his pants and told J to suck his penis. J performed fellatio on the defendant, and then the defendant reciprocated by performing fellatio on J. They stopped when their grandmother called

them inside for dinner. J testified that, in this instance, and the incidents that followed, he did what the defendant told him to do because the defendant threatened to beat him with a bat.

### Counts Three and Four: Behind Defendant's House Near Train Tracks

The prosecutor adduced evidence that, "after the first incident," on two occasions, J and the defendant engaged in sexual activity in the woods behind the defendant's house. On the first occasion, the defendant and J, who had been playing with a group of friends, walked away from the group and into the woods, toward the train tracks. The defendant told J to stand near a tree, where he removed J's shirt and shorts and pretended to tie him to the tree. J testified that the defendant then walked away and "pretended that we . . . crashed from a plane or something." When the defendant returned, the defendant and J performed fellatio on one another. They stopped when their friends called out looking for them.

### Counts Five and Six: Behind Defendant's House in Woods near Rock

Regarding the second instance in which the defendant and J engaged in sexual activity in the woods behind the defendant's house, J testified that they walked farther into the woods. There, they sat on a rock and performed fellatio on one another. The sexual activity stopped when the defendant's father called for them.

### Counts Seven and Eight: Defendant's Basement

J testified that, on another occasion, he and the defendant were at the defendant's house. The defendant's father, who worked the night shift and thus was home during the day, was taking a shower upstairs. The defendant told J to follow him down the stairs into the basement. It was dark there, and "everything was like concrete and metal . . . ." Once downstairs, J and the defendant removed their clothing and sat in a small sandbox. The defendant, using baby oil to lubricate his penis, inserted it into J's anus. After two minutes, J inserted his penis into the defendant's anus. They stopped when they the heard the water from the upstairs shower stop running.

### Counts Nine and Ten: J's Bedroom

J testified that on another occasion, something similar to the sexual activity in the basement occurred in his bedroom. On a day that J was dropped off at his grandparents' house, he walked to his house to feed his cats and clean the litter box. As he was finishing and washing his hands, he looked up and saw the defendant standing at the door. The defendant unlocked the door with a spare key that was kept at their grandparents' house and came inside. The defendant then "pushed"

J up the stairs, where the engaged in anal intercourse and performed fellatio on one another. They stopped when their grandmother called the house looking for them. J testified that he knew it was his grandmother calling because the telephone in his house had a caller identification feature that announced the name of the caller after a series of rings.

### Counts Eleven and Twelve: Grandparents' Barn

The prosecutor adduced evidence that there was "another time" that "something of this nature" happened. J testified that, on that occasion, the defendant told him that he found "something cool . . . ." The defendant then led him into their grandparents' barn, shut the doors, and put him on a couch. There, the defendant pulled down J's pants and "licked [his] butt." J then did the same thing to the defendant. After five minutes, they heard their grandfather calling them inside and stopped.

### Counts Thirteen and Fourteen: J's Basement

The prosecutor asked J if he could recall another occasion when "something of this sort of nature occurr[ed] in another location . . . ." J testified that "it was another time that I was doing my chores. I had finished cleaning the cat box. And this time it was before the other time that . . . it happened at my house." J testified that the defendant came in "right after I had finished washing my hands, and he brought me downstairs." The defendant allegedly pushed J onto a pile of clothing, pulled down his pants, and "licked [his] butt." J testified that the defendant stopped after five minutes because he did not want their grandmother to call the house *again*, prompting the prosecutor to ask, "So, this happened after the other time in your bedroom . . . ." J responded in the affirmative.

On the basis of the above-described testimony, the jury returned a verdict of guilty on count two, of which the defendant subsequently was acquitted by the court; guilty on count six and guilty on count ten, both of which alleged first degree sexual assault; and guilty on count fifteen, which alleged risk of injury to a child. The court acquitted the defendant on counts eleven and twelve at the close of the state's case-in-chief and, thus, those counts were not submitted to the jury. The jury found the defendant not guilty on all other charges. As a consequence, five of the seven incidents described by J were rejected as bases for criminal liability by the jury or the court. The two incidents remaining, which are the subject of the conviction on appeal, include the incident involving fellatio behind the defendant's house in the woods near the rock, and the incident in J's bedroom involving fellatio and/or anal intercourse.[29] Thus, the issue is whether the evidence supports a conclusion that these two incidents took place after the defendant's fourteenth birthday, as is required to con-

vict and sentence him as an adult.

As illustrated by J's testimony, the questions posed to him by the prosecutor centered on the location and the conduct involved in each of the charges, not the time frame. When the prosecutor did try to clarify when the assaults took place, J suggested that the incidents happened over a wide-ranging period of time, as demonstrated by the following exchange between the prosecutor and J concerning the incident behind the defendant's house, near the train tracks. The prosecutor asked J whether this incident occurred in the same time frame as the first incident:

"[The Prosecutor]: Okay. And was this . . . around the same time frame [as the first incident]?

"[J]: Relatively.

"[The Prosecutor]: When do you think this occurred?

"[J]: Fall.

"[The Prosecutor]: Of what year?

"[J]: Two thousand ten, maybe.

"[The Prosecutor]: Okay. . . . [W]hat grade were you in?

"[J]: That year I would be in seventh grade.

"[The Prosecutor]: Okay. Let me . . . let me just ask you this: how old were you when this was happening?

"[J]: Nine or ten."[30]

The testimony of S and Detective Dragon established that the crimes were reported to the police in August, 2010, more than one year after J began counseling in June, 2009. J testified that there was no contact between him and the defendant following S's discovery of the photograph of his penis. S testified that she discovered the photograph in June, 2009. J's aunt also confirmed that he had disclosed the sexual abuse to her in June, 2009. Thus, to the extent that J testified that the sexual activity was still ongoing in the fall of 2010, after it had been reported to the police, his statement appears to be inaccurate, as established by his later statement that the incidents took place when he was nine or ten years old.

On cross-examination, J's uncertainty concerning the time frame of the assaults was equally patent:

"[Defense Counsel]: And you also indicated that these [incidents] happened [when you were] about nine or ten and [the defendant] was two years older than you. So, this would have happened when [the defendant] was twelve or thirteen; isn't that true?

"[J]: Yeah.

                              ***

"[Defense Counsel]: I'd like to talk to you a little bit

about . . . with respect to the time frame that you claimed all this happened; okay? When you first started talking, you made a mention that this all started at the end of fourth grade. Is that what your testimony is today?

"[J]: Yes.

"[Defense Counsel]: And then you talked about, it happened maybe a month apart?

"[J]: Yes.

"[Defense Counsel]: Okay. So, you're claiming all this happened within a month?

"[J]: No.

"[Defense Counsel]: So, what is your claim with respect to when you claim this happened?

"[J]: Could you explain?

"[Defense Counsel]: When do you claim this happened?

"[J]: What are we talking about? Like, everything?

"[Defense Counsel]: Yes.

"[J]: I meant that it all took place, like—not just, like, in a month. Like, a month in between each incident.

"[Defense Counsel]: So, you're claiming it was once a month. That's your claim here today.

"[J]: Yes.

"[Defense Counsel]: . . . Now, you remember talking to [Cheyne] in August of 2010.

"[J]: Yes.

"[Defense Counsel]: Is that correct? And do you remember telling her one time that it started in the end of fourth grade. Is that what you remember telling her?

"[J]: Yes.

"[Defense Counsel]: Do you remember telling her that the last it happened was October of fifth grade?

"[J]: No.

"[Defense Counsel]: Okay. And do you remember telling her that—okay, so, if it started [at] the end of fourth grade, you would agree with me that's June, right?

"[J]: Yeah.

"[Defense Counsel]: Okay. And the beginning of fifth grade is—is October, you said, I think; right?

"[J]: Yeah.

"[Defense Counsel]: All right. So, that's, what, a four month period; is that fair?

"[J]: Yeah.

"[Defense Counsel]: Do you remember telling [Cheyne] on another occasion that sometimes it happened in the fall, sometimes it happened in the winter, sometimes it happened in the spring? Do you remember all that talk?

"[J]: Yes.

"[Defense Counsel]: Okay. Would you agree with me that between June and October is not in the spring?

"[J]: Yeah."

In considering this testimony, we note that there was no evidence presented by the state to establish J's age or the year when he attended fourth or fifth grade. Consequently, to the extent that his testimony focused on crimes that occurred when he attended those grade levels, there is no basis to determine how old J—and by extension, the defendant—was at that time.

There was little attempt by the state to establish a more specific time frame or time line of events, as demonstrated by the following exchange between the prosecutor and J on redirect examination:

"[The Prosecutor]: [D]o you know—do you know all the dates when all these different things happened with any degree of certainty?

"[J]: No.

"[The Prosecutor]: And you're how—again, you're fourteen years old today?

"[J]: Yeah.

"[The Prosecutor]: That was your testimony? And back—back when this happened, you would have been about eleven? Ten or eleven?

"[Defense Counsel]: Objection. He testified he was nine or ten at the time of the incidences. . . .

"[The Prosecutor]: Nine or ten?

"The Court: That's true.

"[J]: Yeah. . . .

"[The Prosecutor]: So, several years ago.

"[J]: Yeah.

"[The Prosecutor]: And back when you were that age, did you carry a calendar around with you?

"[J]: No.

"[The Prosecutor]: Did you have a watch with you?

"[J]: No.

"[The Prosecutor]: Did you have an iPhone with you that had the dates on it?

"[J]: No.

"[The Prosecutor]: Did you make a journal that—

where you wrote down the dates every time your cousin assaulted you?

"[J]: No."

Pursuant to this court's careful review of the record, the testimony established that J was nine or ten years old at the time of the assaults. Within that two year time frame, there is a seven month span of time in which the assaults may have occurred, according to J's testimony. Within that seven month time frame, there are two incidents underlying the defendant's conviction. From this evidence, the court deemed it possible for the jury to have found, beyond a reasonable doubt, that these two incidents took place, as charged, on or about June, 2009, and, thus, after the defendant's fourteenth birthday.

### Court's Ruling

At the outset of the hearing, the court noted that "to be tried as an adult, the defendant must have been fourteen years old when the criminal conduct occurred. In this case the evidence established that the defendant turned fourteen on September 17, 2008. There is no doubt that being tried as an adult exposes the defendant to greater punishment than if he had been tried as a juvenile." The court, in considering the evidence at trial, stated that it was "trouble[ed]" by the state's allegation that the assaults had taken place in June, 2009. Specifically, the court stated: "The state is given lots of leeway in terms of specificity in charging child sexual assault cases. If the state had simply alleged on or about 2009, then we would not have an issue here. But by charging on or about June, 2009 . . . and then the court, in instructing that the state must prove beyond a reasonable doubt that on or about the dates specified in the information the defendant engaged in sexual intercourse with [J], these seven incidences reasonably could not have occurred on or about June of 2009; in other words, how can seven instances that did not occur within the same month, but about a month apart, all have occurred about June of 2009?"

The court reasoned that although there was no direct testimony to establish that the assaults took place in June, 2009, the testimony did establish that S discovered the photograph of J's penis on her cell phone in the second to last week of June, 2009. The court concluded that this evidence, coupled with J's testimony that the assaults occurred when he was nine or ten, permitted an inference that the abuse was still occurring in June, 2009.

The court reasoned that J "also testified that the different incidences were maybe a month apart . . . . On cross-examination he clarified that these incidences did not occur within one month, but, like, a month in between each incident. . . . He also testified he did not know when the dates were with certainty. . . . [J's]

mother found the picture on the cell phone in late June of 2009. *While there's no direct testimony as to whether the acts occurred close in time to when [S] found the [photograph on her] cell phone, an inference can be made that they did, since [J] testified he was nine or ten when the acts occurred.*

"The fact that he said he was nine or ten when these acts were happening—he was ten in June of 2009—in mind with the fact that [J] testified he took a picture of his penis at the defendant's request and [S] found the picture in June of 2009, a reasonable inference can be drawn that sexual activity was still occurring between [J] and the defendant in June of 2009." (Emphasis added.)

On the basis of its determination that the conduct was ongoing in June, 2009, and that the incidents occurred about one month apart, the court concluded that the incident that J described as having occurred first, the incident behind the grandparents' barn, could not have taken place in June, 2009. The court thus acquitted the defendant on count two.[31] The court ruled that the conduct at issue in the remaining counts—particularly, the incident involving fellatio in the woods behind the defendant's house on the rock and the incident involving fellatio and/or anal sex in J's bedroom—could have taken place in the June, 2009 time frame. Thus, the court sustained the defendant's conviction on those counts.

Undergirding the court's analysis is the notion that the jury found, based on the court's instruction, that the crimes occurred "on or about June of 2009," which it appears to have construed to mean that the jury determined that the crimes occurred in June, 2009. There are two problems with the court's assumption. First, without any instruction by the court defining the descriptor, "on or about," this could be taken to mean, consistent with the testimony presented, that the incidents took place over a wide-ranging period of time. Indeed, the state appears to have proceeded to trial with that mindset. Second, the jury was instructed that the state was not required to prove when the incidents occurred. Specifically, the jury was instructed: "The state does not have to prove the exact date of the offense charged beyond a reasonable doubt, only that the alleged act as charged occurred on or about June, 2009." For these reasons, the instruction was an improper basis for the court's determination that the jury had made a finding as to the time frame of the offenses of which it found the defendant guilty.

We turn next to the court's related conclusion that an inference could be drawn that the acts occurred "on or about June, 2009," on the basis of S's discovery of the photograph in the second to last week of June. The defendant argues, and we agree, that the discovery of the photograph is an untenable basis for the inference drawn by the court that, the crimes occurred in the

time frame alleged.

The evidence concerning S's discovery of the photograph is as follows. S testified that she discovered the photograph of J's penis on her cell phone in June, 2009. She testified that she looked at her cell phone because it was lit up, which she thought was unusual given the early morning hour. She found a text message, or "small conversation," between J and his friends, which prompted her to search the contents of her cell phone. She then found the photograph of J's penis. After discovering the photograph, she woke up J, who admitted that he had taken the photograph of his penis and claimed that he had done so at the defendant's request.

The photograph, however, which was not introduced into evidence, had no connection to the charges, which were premised on allegations that the defendant engaged in sexual intercourse with J and that he had illegal contact with J's intimate parts. There was no testimony suggesting when the photograph was taken. There was no testimony that the photograph had been found in connection with a communication between the defendant and J. The state did not present evidence pertaining to the cell phone records of S. To be clear, the only evidence linking the photograph to the defendant at all was J's testimony that he took the photograph of himself at the defendant's request. Moreover, the testimony of S expressly foreclosed any connection between her discovery of the photograph and the time frame of the offenses. When S was questioned regarding her conversation with J immediately following her discovery of the photograph, she was unable to provide any information about the timing of the assaults:

"[The Prosecutor]: Okay. And did he indicate to you when the activity occurred?

"[S]: He—I did not receive a lot of details. . . .

"[The Prosecutor]: So, you didn't—you didn't—you didn't get a lot of detail—you didn't get any more information?

"[S]: No."

In short, S's testimony concerning the discovery of the photograph in her cell phone in June, 2009, and J's subsequent admission to S as a result of that discovery, has no bearing on when the assaults took place. The trial court's determination that an inference could be made that the acts were then occurring because J narrowed the time frame of the assaults to a two year time period, when he was nine or ten, and S discovered a photograph on her cell phone when he was ten, is simply unsupportable.

The only thing that the evidence reasonably tended to support is that there were seven incidents, over a period of several months, when J was nine or ten. The window of time in which the assaults could have

occurred, on the basis of this testimony, extended from J's ninth birthday, on December 31, 2007, to the date of the discovery of the photograph in June, 2009, when S terminated all contact between the boys. The defendant turned fourteen on September 17, 2008. Contrary to the court's determination, however, there is no way to determine when these incidents began or ended within that window of time—and there is certainly no basis to conclude that any of them took place on or after September 17, 2008. Although the prosecutor appeared initially to lead J's testimony with the June, 2009 time frame as a marker, J testified that the incidents took place over several months, making it impossible for the incidents to have commenced and ended in June, 2009. In the forensic interview, which was offered by the state, in part, to corroborate J's testimony as to the timing of the assaults, J stated that the incidents spanned several months, almost one year, in a different time frame, beginning in the fall of fourth grade. There again, however, no year was mentioned. In the interview, J also suggested that the defendant was twelve or thirteen at the time of the assaults—a fact that J confirmed on cross-examination.

Finally, because there is limited evidence as to the sequence of the incidents, even if one were to try to affix a starting point to that sequence, there are several hundred possible permutations of these events, making it impossible to determine which incident occurred when.[32] This, of course, is of critical importance here because the defendant was acquitted of all charges in connection with five of the seven incidents. In conclusion, there is no way to determine, without resorting to speculation and conjecture, whether the defendant engaged in the sexual misconduct underlying the offenses of which the jury found him guilty on or after his fourteenth birthday.

While the original warrant, alleging that the acts occurred in June, 2009, may have been facially sufficient for a mandatory transfer to the regular criminal docket pursuant to § 46b-127 (a), the evidence to support the state's allegations as to the time frame of the defendant's alleged conduct was woefully deficient. The state failed to establish, by any burden of proof, that the defendant was at least fourteen years old when he engaged in the conduct underlying the convicted offenses. Hence, the court had no authority to render judgment against him as an adult offender. Accordingly, we conclude that the court erred in denying the defendant's motion to dismiss the amended information and transfer his case back to the juvenile docket.[33]

The judgment of conviction is vacated and the case is remanded to the trial court with direction to grant the motion to dismiss the amended information and to transfer the matter back to the juvenile docket for further proceedings in that forum according to law.

In this opinion the other judges concurred.

\* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

[1] Although § 46b-127 has been the subject of several amendments since the time of the alleged crimes and the defendant's transfer from the juvenile docket to the regular criminal docket of the Superior Court, those amendments have no bearing on the merits of this appeal. For convenience, we refer to the current revision of § 46b-127.

[2] Alternatively, the defendant claims that the court committed error as to certain evidentiary rulings, thereby entitling him to a new trial. The defendant has offered scant analysis to support these claims and has failed to assert or argue how the court erred in its rulings. "Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Internal quotation marks omitted.) *Kelib* v. *Connecticut Housing Finance Authority*, 100 Conn. App. 351, 353, 918 A.2d 288 (2007). We thus decline to consider these claims.

[3] The defendant's mother is the sister of J's father.

[4] The state introduced evidence of the defendant's and J's birth dates to establish the age differential between the defendant and J under § 53a-70 (a) (2), which provides that a person is guilty of sexual assault in the first degree when such person "engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

[5] R and G are the parents of the defendant's mother and J's father.

[6] S later deleted the photograph. J testified that he sent the photograph of his penis to the defendant. There was no evidence at trial concerning S's cell phone records, the defendant's cell phone records, or the alleged transmission of any photograph.

[7] The parties stipulated to the introduction of the forensic interview at trial for a limited purpose—the defendant, on the ground that J's statements during the interview were materially inconsistent with his statements at trial, and the state on the ground that J's statements were materially consistent. During deliberations, the jury asked to see and was shown the forensic interview in its entirety a second time.

[8] J described a red, plastic bat, a wooden bat, a wooden bat engraved with his initials, a blue metal bat with a black handle, and a blue metal bat with a gray handle.

[9] The colloquy on that subject was as follows:

"Cheyne: You said that these incidents happened during on Tuesdays and Thursdays during track practice, after track practice?

"J: Yeah, after track practice and sometimes when track practice and track, like, was over during the winter. Like, every time that he, like, did it, it would be in a different month. Like, it started in autumn, went to winter, summer, spring. He did it for a whole year, I think.

"Cheyne: Okay, it started in autumn when you were in fourth grade?

"J: Yes.

"Cheyne: Okay. And went and continued through?

"J: Winter . . .

"Cheyne: Winter you were still in the fourth grade?

"J: No, winter, it was, um, the, like, the middle of fourth grade.

"Cheyne: Winter was the middle of fourth grade, and then spring was the end of fourth grade?

"J: Yeah: And then summer of fourth grade, and then the autumn of fifth grade.

"Cheyne: Autumn of fifth grade. Okay, the autumn of fifth grade. And what was the last time?

"J: The last time was, like, the first day of autumn, I think. . . .

"Cheyne: The very last time, what month do you think, what month was it?

"J: I would have to say, like, maybe October.

"Cheyne: Tell me what makes you say it's October.

"J: Well, because in the forest the leaves were starting to change and fall off.

"Cheyne: And this was October of fifth grade?

"J: Yeah."

[10] The transfer order contains the following notation: "[p]rosecutor reports date of incident is June, 2009 . . . [the defendant's] date of birth is [Septem-

ber 17, 1994]. Probable cause was found on [December 2, 2011]. Case is transferred to the adult court . . . ."

[11] S and J's aunt testified as to their conversations with J following his disclosure. The court instructed the jury that it could consider this evidence to corroborate the fact that at a certain point in time J made a complaint or statement to S and his aunt concerning the assaults.

[12] The court rendered a judgment of acquittal on two counts for lack of proof of the element of penetration.

[13] At trial, the defense argued that this "uncontroverted testimony" served to undermine J's testimony as to the time frame of the alleged assaults, and undercut any claim that the alleged assaults took place after the defendant's fourteenth birthday, which, as noted previously, was September 17, 2008. Review of the record, however, reveals that S testified concerning J's after-school schedule in 2009 and testified that he went to his grandmother's house after school.

[14] The defendant also argued that J's "wildly inconsistent" testimony could not support a guilty verdict.

[15] On appeal, the state correctly points out that § 46b-127 (a) (2) permits transfer only on motion of the prosecution and is limited to certain offenses.

[16] The court stated: "I'm going to deny the motion at this point in time and note that under Practice Book § 42-56, should there be a conviction, the defense is permitted to file what's called a motion in arrest of judgment."

[17] The defendant is not currently incarcerated. After imposition of the sentence, the trial court released the defendant on bond pending appeal.

[18] General Statutes § 46b-120 (1) defines "child" in relevant part as "any person under eighteen years of age . . . ."

[19] General Statutes § 46b-127 provides: "(a) (1) The court shall automatically transfer from the docket for juvenile matters to the regular criminal docket of the Superior Court the case of any child charged with the commission of a capital felony under the provisions of section 53a-54b in effect prior to April 25, 2012, a class A or B felony or a violation of section 53a-54d, provided such offense was committed after such child attained the age of fourteen years and counsel has been appointed for such child if such child is indigent. Such counsel may appear with the child but shall not be permitted to make any argument or file any motion in opposition to the transfer. The child shall be arraigned in the regular criminal docket of the Superior Court at the next court date following such transfer, provided any proceedings held prior to the finalization of such transfer shall be private and shall be conducted in such parts of the courthouse or the building in which the court is located that are separate and apart from the other parts of the court which are then being used for proceedings pertaining to adults charged with crimes.

"(2) A state's attorney may, at any time after such arraignment, file a motion to transfer the case of any child charged with the commission of a class B felony or a violation of subdivision (2) of subsection (a) of section 53a-70 to the docket for juvenile matters for proceedings in accordance with the provisions of this chapter.

"(b) (1) Upon motion of a prosecutorial official, the superior court for juvenile matters shall conduct a hearing to determine whether the case of any child charged with the commission of a class C, D or E felony or an unclassified felony shall be transferred from the docket for juvenile matters to the regular criminal docket of the Superior Court. The court shall not order that the case be transferred under this subdivision unless the court finds that (A) such offense was committed after such child attained the age of fourteen years, (B) there is probable cause to believe the child has committed the act for which the child is charged, and (C) the best interests of the child and the public will not be served by maintaining the case in the superior court for juvenile matters. In making such findings, the court shall consider (i) any prior criminal or juvenile offenses committed by the child, (ii) the seriousness of such offenses, (iii) any evidence that the child has intellectual disability or mental illness, and (iv) the availability of services in the docket for juvenile matters that can serve the child's needs. Any motion under this subdivision shall be made, and any hearing under this subdivision shall be held, not later than thirty days after the child is arraigned in the superior court for juvenile matters.

"(2) If a case is transferred to the regular criminal docket pursuant to subdivision (1) of this subsection, the court sitting for the regular criminal docket may return the case to the docket for juvenile matters at any time prior to a jury rendering a verdict or the entry of a guilty plea for good cause shown for proceedings in accordance with the provisions of this chapter.

"(c) Upon the effectuation of the transfer, such child shall stand trial and be sentenced, if convicted, as if such child were eighteen years of age. Such

child shall receive credit against any sentence imposed for time served in a juvenile facility prior to the effectuation of the transfer. A child who has been transferred may enter a guilty plea to a lesser offense if the court finds that such plea is made knowingly and voluntarily. Any child transferred to the regular criminal docket who pleads guilty to a lesser offense shall not resume such child's status as a juvenile regarding such offense. If the action is dismissed or nolled or if such child is found not guilty of the charge for which such child was transferred or of any lesser included offenses, the child shall resume such child's status as a juvenile until such child attains the age of eighteen years.

"(d) Any child whose case is transferred to the regular criminal docket of the Superior Court who is detained pursuant to such case shall be in the custody of the Commissioner of Correction upon the finalization of such transfer. A transfer shall be final (1) upon the arraignment on the regular criminal docket until a motion filed by the state's attorney pursuant to subsection (a) of this section is granted by the court, or (2) upon the arraignment on the regular criminal docket of a transfer ordered pursuant to subsection (b) of this section until the court sitting for the regular criminal docket orders the case returned to the docket for juvenile matters for good cause shown. Any child whose case is returned to the docket for juvenile matters who is detained pursuant to such case shall be in the custody of the Judicial Department.

"(e) The transfer of a child to a Department of Correction facility shall be limited as provided in subsection (d) of this section and said subsection shall not be construed to permit the transfer of or otherwise reduce or eliminate any other population of juveniles in detention or confinement within the Judicial Department or the Department of Children and Families.

"(f) Upon the motion of any party or upon the court's own motion, the case of any youth age sixteen or seventeen, except a case that has been transferred to the regular criminal docket of the Superior Court pursuant to subsection (a) or (b) of this section, which is pending on the youthful offender docket, regular criminal docket of the Superior Court or any docket for the presentment of defendants in motor vehicle matters, where the youth is charged with committing any offense or violation for which a term of imprisonment may be imposed, other than a violation of section 14-227a or 14-227g, may, before trial or before the entry of a guilty plea, be transferred to the docket for juvenile matters if (1) the youth is alleged to have committed such offense or violation on or after January 1, 2010, while sixteen years of age, or is alleged to have committed such offense or violation on or after July 1, 2012, while seventeen years of age, and (2) after a hearing considering the facts and circumstances of the case and the prior history of the youth, the court determines that the programs and services available pursuant to a proceeding in the superior court for juvenile matters would more appropriately address the needs of the youth and that the youth and the community would be better served by treating the youth as a delinquent. Upon ordering such transfer, the court shall vacate any pleas entered in the matter and advise the youth of the youth's rights, and the youth shall (A) enter pleas on the docket for juvenile matters in the jurisdiction where the youth resides, and (B) be subject to prosecution as a delinquent child. The decision of the court concerning the transfer of a youth's case from the youthful offender docket, regular criminal docket of the Superior Court or any docket for the presentment of defendants in motor vehicle matters shall not be a final judgment for purposes of appeal."

[20] Whenever a child is brought before the Superior Court on charges, the court must first determine whether there is probable cause to believe that the child has committed the acts alleged. See General Statutes §§ 46b-128 (a) and 46b-133 (c). The order to transfer is a ministerial act performed by the juvenile court judge. In 1995, the legislature eliminated the previous requirement that transfer to the adult docket occur only after an evidentiary hearing and the issuance of certain written findings by the juvenile court judge to support the transfer order; see *In re Edwin N.*, 215 Conn. 277, 280, 575 A.2d 1016 (1990) (valid transfer requires written findings after hearing); following the amendment of the transfer statute by No. 95-225 of the 1995 Public Acts, § 46b-127 (a) (1) "prohibits the juvenile court from participating in any meaningful manner with respect to the transfer of those individuals at the time of the automatic transfer." *State* v. *Angel C.*, 245 Conn. 93, 115, 715 A.2d 652 (1998). Under the current law, "counsel may appear with the child but shall not be permitted to make any argument or file any motion in opposition to the transfer. . . ." General Statutes § 46b-127 (a) (1).

[21] General Statutes § 46b-121 (a) (2) provides: "Juvenile matters in the

criminal session include all proceedings concerning delinquent children within this state and persons eighteen years of age and older who are under the supervision of a juvenile probation officer while on probation or a suspended commitment to the Department of Children and Families, for purposes of enforcing any court orders entered as part of such probation or suspended commitment."

[22] Our Supreme Court has held that adult and juvenile matters are not coextensive proceedings under Connecticut law. See *State* v. *Ledbetter*, supra, 263 Conn. 4 (confessions law governing juvenile proceeding inapplicable in adult proceeding); *In re Jan Carlos D.*, 297 Conn. 16, 25, 997 A.2d 471 (2010) (speedy information provision under General Statutes § 54-1f [a] not applicable to juvenile summons and complaint), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 747–48, 754, 91 A.3d 862 (2014); *In re Prudencio O.*, supra, 229 Conn. 698–99 (sixty day period for provision of probable cause hearing under General Statutes § 54-46a not applicable to juvenile proceedings).

[23] In *Torres*, the trial court ruled that the state had failed to establish probable cause to proceed with the murder charge that had precipitated the defendant's transfer to adult court. *State* v. *Torres*, supra, 206 Conn. 350. The state then filed a substitute information charging the defendant with manslaughter in the first degree with a firearm. Id. After the defendant unsuccessfully moved the court to dismiss his case or transfer it back to juvenile court, he pleaded nolo contendere to the substitute charge and was sentenced accordingly. Id.

[24] The court in *Angel C.* distinguished *Kent* v. *United States*, supra, 383 U.S. 541, where the United States Supreme Court held that a transfer statute that deprives a juvenile of his or her right to be tried in juvenile court without a hearing constituted a violation of due process. Our Supreme Court reasoned that the statute at issue in *Kent* vested original and exclusive jurisdiction in the juvenile court and permitted it to waive jurisdiction and transfer to the regular docket only after a full investigation. *State* v. *Angel C.*, supra, 245 Conn. 107. By contrast, our mandatory transfer provision denies the accused his or her juvenile status ab initio on the basis of the delineated statutory criteria, i.e., the defendant's age and the alleged commission of certain offenses. Id. Under § 46b-127 (a), the juvenile court does not have exclusive jurisdiction, nor is it given a waiver. Id., 114–15. Accordingly, "a juvenile who is at least fourteen years of age and charged with certain offenses has no constitutionally cognizable liberty interest in juvenile status." Id., 121.

[25] The defendant further argues that the United States Supreme Court's holding in *Apprendi* v. *New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) constitutionally dictates that the defendant's age, at the time of the offense, be established. More specifically, he claims that his age is an element that increases the punishment and, thus, pursuant to *Apprendi*, there must be proof beyond a reasonable doubt to support a jury finding that the crimes in question occurred after he reached the age of fourteen. We are not of the view that *Apprendi* supports the defendant's claim. In *Apprendi*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id., 490. *Apprendi* does not stand for the broad proposition advanced by the defendant that any factual determination that is causally related to a subsequent penalty imposed must be decided by a jury.

[26] Among the most common collateral consequences of a felony conviction are disenfranchisement, denial of federal benefits, including housing and student loans, registration as a sex offender, and limits on firearm possession. The American Bar Association's House of Delegates has compiled a database, the National Inventory of Collateral Consequences of Conviction, to serve as a guide to defense attorneys and prosecutors in advising and charging decisions. The database lists more than sixteen thousand mandatory collateral consequences for state and federal convictions. See American Bar Association, "National Inventory of Collateral Consequences of Criminal Conviction," available at http://www.abacollateralconsequences.org/ description/ (last visited August 6, 2015).

[27] Our conclusion is consistent with what is already the practice in this state—the state is foreclosed from prosecuting in adult court conduct that occurred before the accused's fourteenth birthday. See *State* v. *Taylor G.*, 315 Conn. 734, 766–67, 110 A.3d 338 (2015) (state amended information because defendant could not be charged as juvenile for conduct occurring prior to fourteenth birthday); *State* v. *Davis*, 76 Conn. App. 653, 668 n.16,

820 A.2d 1122 (2003) (same).

[28] The state does not contest that the defendant's jurisdictional claim is preserved.

[29] There was no specific unanimity instruction or interrogatories requested or given as to the defendant's conduct underlying the criminal charges in counts nine and ten, the incident in J's bedroom. Thus, it is unclear whether the jury found that the defendant committed anal intercourse or fellatio. Accordingly, we refer to the conduct as the court's instruction did, "fellatio and/or anal intercourse."

[30] J became nine years old on December 31, 2007.

[31] On that score, the court stated, "Even in taking into account that [J] was only giving his best estimate and that he was . . . fourteen years old at the time of his testimony, he was testifying to events that allegedly occurred when he was ten years old; it's hard to reconcile the first sexual act . . . as having occurred on or about June of 2009, based upon the evidence presented."

[32] More particularly, we note that the incident behind the grandparents' barn is a fixed point in the sequence of the events, as J identified it as the "first incident." With respect to the two incidents in the woods behind the defendant's house, J confirmed that the incident near the rock came after the incident near the train tracks. J first suggested that the incident in his bedroom occurred before the incident in the defendant's basement. He later stated that the incident in his bedroom occurred after the incident in the defendant's basement. With respect to the remaining incidents, there is no indication at all as to their sequence in the chain of events.

[33] Alternatively, the defendant seeks an acquittal on the asserted basis that no jury reasonably could have found that the crimes occurred on or about June, 2009. The defendant concedes that the timing of the offense is not an element of the crimes, but argues that "it must be shown with some baseline level of precision where the date of [the] offense would be prejudicial to the defendant." In support of his claim, the defendant directs our attention to *State* v. *Morales*, 45 Conn. App. 116, 694 A.2d 1356 (1997), appeal dismissed, 246 Conn. 249, 714 A.2d 677 (1998), on which the trial court relied in acquitting the defendant of count two.

In *Morales*, the defendant was charged with sexual assault in the first degree in violation of § 53a-70 (a) (2) "at some unknown time between the fall, 1989, and June, 1990 . . . ." (Internal quotation marks omitted.) Id., 133. The state's evidence at trial failed to establish that the assaults occurred in the time frame alleged. Id., 136. Subdivision (2) of § 53a-70 (a) did not become effective until October 1, 1989. Id., 133. Accordingly, this court held that the defendant's conviction of sexual assault in the first degree constituted a violation of the ex post facto clause of the federal constitution. Id., 133–36. This court found, however, that sufficient evidence had been presented to justify a finding of guilt beyond a reasonable doubt that the defendant had committed the acts constituting the crime of sexual assault in the second degree, the law proscribing the defendant's conduct prior to the enactment of subdivision (2), and a lesser included offense of sexual assault in the first degree. Id., 136. Accordingly, the defendant's case was remanded for resentencing on that charge. Id.

Although the issue in *Morales* was also one of the sufficiency of the evidence as to the time frame of the offenses, *Morales* does not support the defendant's contention that an acquittal is the appropriate remedy here. Although we conclude that the state did not pursue these charges in the appropriate venue, we are nonetheless satisfied that there is sufficient evidence to support the jury's guilty findings as to the elements of the convicted offenses; therefore, an acquittal on this basis is not justified.